This morning is case number 415-0210 in re Marriage of Janet Vespa Weir for the appellate Howard Feldman and for the appellate Gregory Scott. Mr. Feldman. May it please the court, counsel, my name is Howard Feldman and I represent the appellant cross FLE Janet Vespa Weir. This is a long convoluted record and our position is relatively narrow. The petition for dissolution of marriage in this case was filed in September of 2007. Janet and Ricky were 60 and 49 at the time. Janet had obtained a medical degree from Northwestern University Medical School at a young age, obtained a residency and two fellowships, was practicing in Chicago and in 1990 moved to Springfield accompanied by Mr. Weir. In 1992 they got married. She moved from the SIU School of Medicine into a private practice, Cardinal Respiratory. Mr. Weir became the business manager and obviously the personal partner husband of Janet. Janet practiced medicine, Mr. Weir took care of the business. In 2006-2007 Mr. Weir became aware, subsequently Janet also, that the United States government was looking at Cardinal Respiratory concerning certain billing practices. That resulted eventually in Mr. Weir being excluded from the business by virtue of a court order. There was a contempt finding against him by Judge Scott leading to his basically getting out of the business in that same range. Shortly after that he became aware that the United States Attorney was moving forward with criminal prosecution investigation in grand jury. In September 2007 the divorce was filed and things came to a head. Through a long and protracted series of circumstances Mr. Weir was prosecuted, pled guilty and as a result the trial took a long time to get done. One of the components of the judgment of dissolution of marriage and what brings us here today is the court's direction that Janet is to pay one half of the tax obligation of Mr. Weir arising out of 2007. From time to time lawyers are called upon to put square pegs in round holes and our argument is somewhat in that category because what we're really seeking is not to avoid paying a fair share of the taxes but avoiding once again being taken advantage of by Mr. Weir. The tax obligation, and there wasn't just a, because I'll hear from Mr. Scott so I might as well say it up front like a good bridge you control your hand, there was a court order that both parties were to put $750,000 into our trust account to pay the tax obligation. Neither party did and to be honest with you neither party really objected until after the judgment and neither party really, there's no contempt petitions, there's no real complaints about that. I believe that the record is fairly clear and that may be contained in the briefs but the record is fairly clear that at some point it became fairly reasonable for Janet Despot to not believe anything that was being a proponent or anything that came from Mr. Weir's side, or from Mr. Weir, I don't want to say side, that implicates the lawyer. Mr. Weir is just not an honest provider of information. But whatever it is the court will find in the record that in fact the IRS did an examination and imposed the tax on and did a tax return for Janet, she's paid her taxes in 2007. And through, they did the same thing with Mr. Weir, Mr. Weir and we cooperated in terms of providing some funding for an accountant, obtained an accountant and eventually received a determination of approximately $3 million in taxes owed. Mr. Weir is incarcerated and I believe is still incarcerated although he's getting close to the end of his period of incarceration. Our concern is the way that the order is written and if the court looks at our motion to reconsider, what we really ask the court to do is either reserve it or to us pay half of whatever the actual tax obligation is concerned. And let me be point blank on this, I believe this is a sophisticated panel, the court knows that the IRS can do offers and compromises and can compromise various funds. I can perceive or think of a number of methods upon which Mr. Weir ends up using Janet Weir's half of the tax as his 100% obligation. He says I'll do an offer of compromise, you take a million and a half from Janet Weir and I'll give you $1,000. Don't know that they take it, don't know it's pure speculation, but in effect what the order allows and maybe we should have waited for the order to come down but then we're left with a final order here that says we have half. If he only pays $100,000 and she has to pay a million and a half because there's a judgment, he could just assign that judgment to the federal government. She can't do it, she can't negotiate on behalf of him. He's the taxpayer here, he declares bankruptcy if he can, whatever he does to extinguish his half, she's still obligated to pay half of the tax. It is one more insult in a long series of insults that occurred in this case. So realistically and very simply, we're just asking that this court reserve the obligation of her to contribute to the taxes until he contributes his shares of taxes. He may never pay in. He may have a way to get out of the entire tax burden. She still has a judgment for one half of what the tax burden is and I believe you'll hear Mr. Weir's counsel come up and say we should pay the million and a half. Well I could certainly envision a set of circumstances, I'd certainly do it if I was representing Mr. Weir, saying you've got a million and a half, I don't have the ability to pay you anything more, I'm 69 years old. Does he have any assets left? Oh yeah, he's got two houses, I think he has at least a couple million dollars. Can't you guys go in and get an order making him pay? I don't understand why he can't do that if he's got the funds. So because of the fact that she may be on the hook with the IRS. You know, he's on the hook now, but he's the taxpayer and that's really, it is not my, I don't want to be the proponent of the United States government. If he can avoid and reduce the tax obligation, why should he not avoid and reduce the tax obligation? What you're saying is that the federal government could go against her for the entire amount, her remedy would have to be in state court here collecting against... I'm not sure he would have a state, I'm not sure she would have, that's the problem with the way the order is directed. That she would absolutely have to pay the half, whether he pays the half or not. But this order as it currently stands indicates to pay half each, so it would be a collection effort on her part. In this scenario, this hypothetical you're talking about. It very well may be we would have to go back and do some sort of rule against him saying he didn't pay the million and a half. But if he comes in and provides the satisfaction from the Internal Revenue Service, there's no more money owed. It would be, she's now collecting from him. Maybe it's theoretically possible, but I would ask the court to look at the totality of this record and Mr. Weir. Has it been determined what happened to the Nigerian funds? I don't know that I can answer that. To be honest with you, the money went over there. I did not, for a lot of reasons, I did not try to trace what happened to the $1,400,000 to $1,500,000 that went overseas. You know, we were focused on those monies that were there so that the court understand what happens and some of this may be in reply. There was also a car that was purchased that was going to be shipped overseas and a wedding ring that was going to go overseas. The car, probably outside of the record, but the car precipitated the federal government to move forward very quickly with its prosecution. So I don't know where the money went. Let me ask you another question. It's hard to have much sympathy when the parties present an agreed order to judge an argument. They each agree to put in $750,000. They could have filed a return and paid the taxes then. All of the penalties and interest would have been avoided, which has racked up the bill. So how do we give relief when the parties didn't do what they agreed to do? Listen, I'm not asking, and that's where I talked about the square peg in the round hole. I'm not asking for relief and saying, gee, we shouldn't pay any taxes at all. What I'm saying is, since he's the taxpayer, of the taxes that are paid, it would be, it was argued by me it would be an easy fix that we pay 50% of the actual taxes that are paid. So he's the taxpayer, he pays $100,000, we reimburse him. If he gets away with that, if he pays $3 million, we pay $1.5 million. Under your scenario, what would happen on remand? It would just be an order that upon the tax being paid, we pay one half of what the actual tax paid is. Is IRS going to come against her for the taxes? No. Not directly. This is the problem. He's got a judgment. Okay, there's a judgment order here now. He could assign the judgment. IRS could look at that as an asset and come after her. She seems at risk. And that's why I talked about the square peg. When you read our brief, it may appear that we're trying to get out of the entire tax obligation. And that is not an accurate representation of what we tried to do in the motion to reconsider. That's the only issue we had on our appeal, is that we felt at risk. This woman, if you take a look at the history of the record, she's been a sole parent over three children. Her license was not suspended, although she had to fight for it. She lost her Medicare privileges. And when she lost her Medicare privileges, she lost her ability for hospital privileges, and she lost all of her insurance companies just said no. Effectively, she lost her ability to practice. This is a woman who, when you read the record, became a doctor very young, practiced. There's no medical malpractice history there. But her life was effectively terminated for a period of years. And rather than sit around and do nothing, she went to law school as a mother of three children. She went to law school, and she got up to the date where she was going to take the bar, and the day before the bar exam. They wouldn't let her take it because of the history of what was going on here, the Medicare issues. But she got corrected, she sat for the bar, and she passed. She's lived a nightmare. She's not avoiding her responsibility. And maybe everybody should have put the $750,000 in. I don't think the tax returns would have been done anyway, Your Honor, because quite honestly, there is no way to trust Mr. Weir. Just simply none. He's a dishonest man. He hasn't told the truth. The spin that he tells with regard to the dissipation of, I was sending this money overseas because I was trying to make $18 or $12 billion so I could support my family because I was going to jail, is as preposterous as anything I've ever heard. How long is he in prison for? Still? Is he still in prison? He's still in prison. I believe he will be out later this year, early next year. So he has been in prison since, well, he was detained early on, so since about 2007, 2008. I can't remember the exact date. So she went in, she got a tax determination done as far as her income, and she paid those taxes. For 2007, absolutely, and every year thereafter. When I say tax determination, it was an IRS, came in and did an audit. You know, we weren't, it was a, I don't want to say we weren't involved, but there was an accountant involved. And then he's had a subsequent accountant. So that is our position with regard to these items. Mr. Stelman, I'm not crystal clear on what you're asking this court to do. I'm asking this court to either enter an order saying she should pay one-half of the actual amount paid. Do we know how much that is? We know what the assessment is of $3 million. We don't know if that's what will be paid because we don't know whether or not Mr. Weir either has the ability to pay or the desire to pay. You know, he has retirement accounts. He may do an offer in compromise. I have no idea. Wasn't that assessment reduced? I think it was reduced from six, but I don't. Oh, I thought it was reduced from three to one-and-a-half. I don't believe so. One-and-a-half, I believe, is our obligation. Okay, maybe that's right. So I'm asking the court to remand this. Well, what our concern is I want to make sure that we don't pay Mr. Weir's  The IRS says that's good because he's got the inability to pay. And there's been cooperation on people. The two residences that he will have are awarded to him as a life estate so that they will go to the kids. A good deal of his assets are in, I believe, retirement accounts. So all of that's not predictable? I'm not an IRS expert. So I will not give an answer that I don't know is true. So I will just say I don't know that answer. But I think that the retirement accounts are difficult to get to, plus the offer in compromise. Any further questions? Now, I'm across happily, and I didn't address those issues at this time. Okay, thank you. You'll have rebuttal. Thank you. Mr. Scott. May it please the court, counsel. Let me kind of clear up a few things, if we can. I'd ask this court to look at the April 24, 2008 order that we attached to our brief in our cross-appeal and appellee brief. That order says two things. First of all, they agreed to divide up the big account. My client's entire fidelity account that was in May of 2008 was after all of the earnings in 2007 and after all of the dividends and interest and capital gains in 2007. And if the court will recall the facts, the parties had to liquidate substantial funds to pay the margin account before they divided it. And Dr. Despot Weir received her entire half of all that income, $2.4 million in May of 2008. And they agreed, hey, everybody knows we got a big tax hit here. Everybody's going to be responsible for half. And the order says not only put $750 each in Mr. Feldman's trust account, it says you pay your half of the taxes. It says you file a joint return. Didn't do it. And when you look at our Exhibit 10, she files through the audit, not actually filing a return. She has an audit, and they don't include one dime of all the interest, of the fidelity account. Now, by not filing a joint return with my client, and she chose not to file a court order, she has no obligation for all of those interest, dividends, capital gain taxes associated with the liquidation of that account and dumped entirely into my client's tax return. And in violation of what they agreed to in a court order in April of 2008, she's now saying, hey, even though you said I owe half in 2008, and I agreed to that, now I want you to say, wait a minute. If for some reason his assets don't cover his half, I don't have to pay that much. If you look at our Exhibit 26, our Exhibit 26 is the letter from the accountant, not actually an accountant, he's an attorney, that is dealing with the IRS audit. That IRS audit went from $6,500,000 down to $3,099,000 before additional penalties and interest since the time he wrote that letter. That's just the federal. There's also the state of about $310,000. So if you look at the asset distribution that Judge Narduli did, and I'm not getting into dissipation, as it sits now on the taxes, he would have to liquidate his whole, he has $1,000,007 left, and I answer your question, Your Honor, at the time of trial. She has, with the distribution ordered by the court, over $4,000,007. When the court divided the assets, and this is something that I don't know if it can be picked up easily from the record, in May of 2008, the judge says, Okay, lady, you get your half, $2.4 million. Sir, you get your half, $2.4 million, and whatever you do with it, it's yours. Well, Mr. Weir used his money, and at the time of trial, his money was down to $1,072,000 because of the fact that he spent money defending himself in the federal court system, which is his election. Her money, she didn't touch. It went to $3,000,007. Now, when you look at the effect with the distribution and the majority of the money that was held in the bond going to her, she has over $4,200,000 to pay her $1,700,000 and still has substantial money left, substantial money left, almost $3,000,000 at the time of trial money. As far as the court's question, can all of his assets be reached for tax purposes? I happened to practice with a CPA brother who said, Yes. That's my information. I'm not a tax expert, but all assets are subject to attachment. The IRS can attach whenever they want. Or it's a life estate. Now, the life estate is just in the two pieces of real estate. It's a real estate, but they can't get it back. Well, they can try and get whatever the reasonable rental value is as long as he's alive. But the idea of that is to try and preserve something for the kids, given his age and health issues. Why didn't the parties follow the order that they presented to Judge Nardulli and agreed to? Your client didn't do anything either. My client didn't? And would I have told him to do that? Most likely. I can't tell you what we talked about. Well, I assume you all presented the order, so I assume that was your advice to your client. I've never told a client not to obey a court order. I can tell the court that truthfully. And the problem is that neither party did it. A lot of craziness went on with criminal trials, being sentenced, being in jail. It was a very protracted, as Mr. Feldman said, hearing. Mr. Scott, what's your objection to Mr. Feldman's proposal? If the IRS compromises your client's tax liability on the whole amount that's going, since she paid her own, what's wrong with saying the parties are to pay half of whatever the IRS actually determines they have to pay? Well, the problem with that is that my client could be on the hook for considerably more. He can't negotiate with the IRS and say, like Mr. Feldman says, oh, I'm only going to pay you $1,000 when he's got $1.7 million in assets. They're going to take everything he has. And if they do that, then isn't she going to pay her half? What Mr. Feldman says is if his half is now worth $1.7 million, and he owes $2 million now with the interest and penalty, he's still on the hook for his half of the difference, $2 million less than $1.7 million. And Mr. Feldman says, then she's not on the hook for the other. But between the IRS and a taxpayer, whatever she doesn't pay, he's on the hook for. So let's just say he gets out of prison and he wins the lotto. I don't even know if he can play the lotto. I'm sorry, I don't know that. But say he wins that. Then the money that he didn't pay the IRS, or that she didn't pay the IRS, is still tagged to him. Couldn't he go back to court and get an enforcement order to get her to pay her half? Well, not if the court remands and says you only have to pay what he pays. The IRS is totally separate from us, or from our proceeding. They can or cannot agree to take less, but they are not going to take less if she is obligated to pay half and has $4 to $5 million. It makes it impossible for him to say, hey, my $2 million, I've got $1.7 million in money, take it, we're all done. He can't do that. Along the same lines of what I asked Mr. Feldman, if the IRS sought to collect everything from your client, say it went back on remand and the trial court ordered each party to be responsible for half of the tax obligation as determined, the IRS collects 100% against your client, then your client is in a position, given the court's order, to seek collection of the half that she was responsible for from her. Is that right? No. Well, I could go into court and try to hold her in contempt for not paying, but quite frankly... But you would have a state court order obligating her to half of the IRS obligation. Which is an asset the IRS would have to take. The IRS has no direct collection against her. So there's no relationship on 2007 tax returns. So in essence, the IRS would have to come in, take everything my client has. Part of what he has is a court order that says she is obligated for a debt. So as I would follow the bouncing ball, they would then have to enforce my client's right against his former spouse if he hasn't done that already. Why would the IRS seek to collect the entire tax debt of her obligation from your client as opposed to from her? Because they have no ability to collect the tax debt from her except through the judgment for dissolution of marriage. They cannot collect the whole $3 million from her under any circumstance. She settled her tax liability. Yeah, without reporting all of the income. I'm just saying regardless of who's right or wrong. She's finished as far as the IRS is concerned. And they will only look to him for payment. That's correct. We filed a cross appeal. And there's some things that I'd like to point out with regard to that. First of all, the biggest area is the dissipation claim. And we make two statements in that. We say that the court did not, it's against the manifest way of the evidence as to whether or not the court properly found that there was dissipation. And there's two areas that we think the court erred in. The first one is in the fact that the definition of dissipation is that a party in a marriage acts for the sole benefit of that party in derogation of the marital statement. There was no benefit to Rick Weir. Nowhere is there a pot of gold. Nowhere is there a bank account that was to his benefit. Nowhere was there any type of benefit that he received, such as all the dissipation cases. The one individual, O'Neill, he received a defense to a criminal act. The Hashinas case, he bought all kinds of clothes and cars and trips and did all kinds of things like that. Mr. Weir got scammed. Like it or not, dumb, shouldn't have done it. He got hooked. People are going to promise him millions when he has millions and he's in a panic mode. No doubt about it. They're caught by the federal government. He knows it's serious. We have lawyers involved, and this man is panicked. Where did he make his big money before? Just as he testified. Overseas, investing in China. If you look at Petitioner's exhibit, or Respondents' Exhibit No. 1, this account infidelity, I know part of it was on margin, in 2007 was worth over $24 million. Huge money they made. So Mr. Feldman says promises of millions of dollars in return for investment is something that he would never believe in. I don't think so, because he's already lived that. He said, okay, I'm going to make a huge amount of money. I'm going to be able to pay everything off. Our family will be taken care of. He made a dumb, dumb, dumb decision. And he kept doing it. Now, there's claims that this was some scheme to hide money overseas, keep it from the government. Look at our Respondents' Exhibit No. 14. Respondents' Exhibit 14 shows that in the process of all this, he got money back. He got $98,000 sent back from these people as one of these returns on his investment, whether it was something to keep him to keep on sending it, I don't know. Yeah, he got hooked on the rings. They said, hey, we're going to make you all this money. Buy these rings for us. Send it to us. He did it. Dumped. He shipped a card over there? I don't even know how to ship a card. I don't know how to ship one either, but apparently he tried, and then he found out that he didn't get paid for the rings, and it stopped. And, you know, the car is still here. Why is he doing that? Because he believed. But she didn't know. He didn't consult with his wife, right? No. Well, what if he had made this bundle of money by shipping the money over there? I'm sorry. And what would have happened with that? If he had made this bundle of money, it would have been a marital asset, and Mr. Feldman would be saying, give me half of the bundle. Now, as far as where it all went, and there was a Federal Bureau of Investigation person assigned to all this, nobody ever found this bundle of money because he got scammed. Mr. Scott, before you even get to the determination of where the money went, in terms of the procedural posture here with the dissipation claim, there has to be a showing made that it occurred during a period where there was an irretrievable breakdown of the marriage, right? That's what I mean. Yes, Your Honor. Okay. What was it here? What was the evidence establishing that the parties were undergoing an irretrievable breakdown of their marriage at the time the alleged dissipation occurred? Judge, and that's our second point. We don't believe there was any evidence of that. In fact, Judge Snarduli held that the marriage was undergoing an irretrievable breakdown, even though she didn't know it, because of his activities with regard to the billing at Cardinal Respiratory, which was the medical practice. And if you look at the facts, what we point out in our brief is that the facts don't support that the marriage was irretrievably broken down. I think we gave you the Romano case that kind of defined irretrievable breakdown. During the summer, when it was summer of 07, when he's sending this money over there, these people are living together. They didn't separate until September of 07, after he stopped sending the money. In addition, they are working with Mr. Potter to put $3.2 million into a trust account and enter a trust that they jointly made to pay for the fines, to pay for any penalties, pay for restitution for Cardinal Respiratory, Dr. Weir, and my client. All of that money was jointly done. Plus, Mr. Weir is paying for all the expenses of operation of Cardinal Respiratory, which is bleeding money. It's not making any money. He's paying for all the expenses at home. She said, I just went out and charged. He paid it. Paid all the expenses. So they're living in the same house. They're sharing expenses. There's no open warfare. There's no discord. Why doesn't she know then that he's sending all this money overseas? Quite frankly, Justice, this whole marriage was one where she didn't pay attention to money. She said, you're in charge of money. I'm in charge of medicine. And it was coming out of a joint account, in part. It was coming out of a single account, in part. And he just handled that. That was what he did. When Cardinal Respiratory wasn't making any money, he covered. He didn't take his salary. He covered. That's the way they operate. When they started losing money, he covered out of his investments. And maybe it's something she didn't want to handle. Maybe it's something she didn't want to look at. Maybe she was afraid of that. I don't know, but that's the way this family operates. Could she have? Sure. It's a joint account. Could have seen it. All of them were at the house, or at the Cardinal Respiratory, in his office. In fact, that's where she says she found all these records. One of the other things, just a mathematical error that we pointed out in our brief, is that what he claimed as dissipation of $1,500,000 is really $1,400,000 and some thousand that we put in our brief because the court didn't give credit for one of those returns. That was the $98,000? Is that what you're talking about? Yes, Your Honor. Did you prove where it came from? Yes, it's in our Respondents' Exhibit 14. And it's on the first page of that exhibit. And that's the area of dissipation. Doesn't that just show the deposit of those funds? There's no source, right? The bank statement doesn't show where those funds came from. Actually, there was attached to that that they were returned from this investment overseas, and that's the testimony. I'm not sure about that. That's my recollection of it, Your Honor. I don't want to argue with you. That's right. You're saying that's the testimony and there's also written documentation. That's just the testimony. As I recall, Exhibit 14 is a very thick exhibit that has each of the statements attached, and it has the source of the $98,000 coming back in. And if you have to compare that actually with our Exhibit 24, which has the tracing of the money out, and you'll see the $98,000 out and the return of the $98,000. And I know it's rather complicated, but that's... But I thought you guys basically gave the Court a huge stack of documents. We did, and we stipulated to all of this. Right. And we argued to the Court and showed the Court in our arguments, we outlined... But arguments aren't evidence. That's the problem. I know. But if you have the evidence in front of you for the Court to compare, I believe that it's accurate in showing that. The other area I want to talk about is maintenance. We believe the Court erred in not ordering maintenance. This is actually a 19-year marriage. By the time the marriage was dissolved, I will acknowledge to the Court that there are five years that they were not together. But this is a 19-year marriage. When Mr. Weir gets out, as we itemized in our arguments, he will have zero income except for Social Security. He will have no assets because he owes more to the IRS, not only for 2007 but 2008 and subsequent years. He will have no income other than Social Security, and he will have no assets to maintain himself. Whereas Dr. Weir has, if she pays her half of the taxes, will have over $3 million in assets. She was generating under $3.7 million in assets, $189,000 that she wasn't even using of money. And she has now resumed her practice. We're going to be making over $100,000 at the time of trial based upon her starting over her practice in the State of Washington. Mr. Scott, we'll take a look at the brief for the rest of that argument. You are out of time. Appreciate it, Your Honor. Rebuttal, please. Dissipation. Look at the exhibit because there was an attempt to transfer. Which one? The one that Mr. Scott just referred to. Okay. The stack of information. There was over $3 million that was attempted to transfer. I don't necessarily say that that money is gone. I don't know that it's gone. Mr. Scott says that it's gone. This money came from an account only in his name. He transferred this money and handled this money only in his name. He told Dr. Weir, hey, we don't have a problem with the federal government. What about the timing of it in terms of what's required in proving it happened during a period where the marriage was irretrievably broke? He was off on his own. Realistically, she didn't know that he was off on his own thing. You know, everybody has taken Mr. Weir's testimony up. I just sent this money over because I wanted to make $18 million or $12 million for the family. From the start of this, he started a process by which he was getting ready to move out. That's the only thing that makes any sense whatsoever if you connect the dots. Whether he was or he wasn't, in reality, I don't know. What goes on in Mr. Weir's head is hard to figure out. I don't think Judge Narduli believed him. I don't think Judge Narduli... About making $12 or $18 million for the family. That's why it's dissipation. He was out there moving that money for himself. He was putting that money in his investment account for himself. But that's not what O'Neill says. The dissent warns of a case like this where the dissent says you can't attach a time frame to it because the statute doesn't call for any specific time frame. And by what the majority did in O'Neill, it will lead to economically unjust results. Because of cases, it looks like this. But this is not... This is far from an economically unjust circumstances. It's like Mr. Weir is not responsible for any of his actions. He has Dr. Despot who has taken care of the kids and tried to get back to work and didn't spend her money on hiring defense counsel. Didn't go to trial, then plead guilty, and then undo the trial claiming that everybody involved in the system was in a conspiracy against him. These aren't me making it up. These are pleadings that are part of the record of what he filed  Mr. Weir says whatever is necessary, and I'll get back to you. I forgot your question, Justice Harris. That he says whatever is necessary at the time that he's doing it. It is just pure fanciful. As far as it... She was... He was making stuff up to her. Is that the traditional marriage breaking down where people are throwing things at each other? No, but if your spouse is in another room sending money overseas without your knowledge, transferring money into an account in their name only... In his prior investments, the overseas investments that actually made... Did she know about those? She had some knowledge, but she didn't know the account was solely in his name. Different than the sending money over by email. Those were legitimate securities in a security account. That was a regular fidelity account. That was not, I'm trying to hide money over here. She was aware they had an investment account. She was caught totally by surprise when she learned that the investment account only had one name on it. Going back to the tax. The... We are not trying to avoid paying tax on the funds that we have. The IRS did the allocation of the money by doing the audit. Allocated to her, allocated to... She didn't say this is mine, this is yours. They did that. We are where we're at with it. If he pays, if he can do an offer in compromise and do $500,000, she pays half. If he pays a million and a half, she pays half. What we don't want to do is pay a million and a half and he says that's it, and we pay the total tax obligation because he says, you know what, I spent all my money on counsel for my criminal case, so I don't have anything left. She pays the million and a half and I get to keep what I have. Mr. Feldman, do you agree with Mr. Scott that that $98,000 should have been taken into the calculation? No, I really don't because, quite honestly, I have no clue what he was doing. We spent a lot of time doing it. Mr. Scott did. There's money flowing back and forth. And there was... I mean, I didn't see anything in that bank statement that indicates the source of that. I don't see the indication of the source. And you just have to go through each of those transactions. It is absolutely incredible. And, you know, Mr. Weir can't have it heads, I win, tails, you lose. And that's what it is. I'm brilliant. I made $12 billion. I did all this foreign investment. Oh, by the way, I'm getting scammed in Africa because I'm an idiot. I bought wedding rings because I'm an idiot. And I bought a new car, and they didn't, you can look at the record, they didn't have new cars. They had old cars. So he buys a brand new car, puts it in the garage, and my time's up. You're out of time. Thanks to both of you. The case is submitted. Excuse me? Is that the way you went over it with him? No? What would you want to rebut? Haven't we covered all the issues? I'll give you a minute. Can I time it for Mr. Scott? I think the clerk can time it. Justice Pope, if you look at Respondents Exhibit 14, the deposit, $98,000, says 7-11-07 Weir. And there are attached to our Exhibit 14 and Mr. Feldman's 24, that actual Weir transfer and receipt. Does it show where it came from? Yeah. It shows it came back from the group overseas. Okay. Thank you. Thank you. Thanks to both of you. The case is submitted. The court stands.